UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

SETH D. HARRIS,
SECRETARY OF LABOR,
UNITED STATES DEPARTMENT OF
LABOR,

          Petitioner,                    CASE NO.: 5:07-cv-182-Oc-10-PRL

v.

A+ NURSETEMPS, INC. and MICHAEL J.
ARTHUR.

          Respondents.

_____/

RESPONDENTS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

      Respondents, A+ Nursetemps, Inc. ("Nursetemps") and Michael J. Arthur ("Mr. Arthur")

(collectively, "Respondents"), pursuant to this Court's Order dated December 18, 2012 (Doc.

83), hereby submit their Proposed Findings of Fact and Conclusions of Law regarding the bench

trial held on the Petition for Adjudication in Civil Contempt and For Enlargement of Judgment

(Doc. 20) filed by Seth D. Harris, Secretary of Labor, United States Department of Labor

("DOL").

I.

PROPOSED FINDINGS OF FACT

A.     **Nursetemps' Business Operations**

      1.     Nursetemps is licensed by the Florida Agency for Health Care Administration

("AHCA") as a nurse registry, meaning that Nursetemps is licensed to procure, offer, promise, or

attempt to secure health-care-related contracts for registered nurses ("RN"), licensed practical

nurses ("LPN"), certified nursing assistants ("CNA"), home health aides, companions, or

homemakers, including but not limited to, contracts to provide private duty or staffing services to health care facilities or other entities.  [12/10, pp. 8, 11-12].[1]

2.      In essence, Nursetemps maintains a registry or database of licensed medical professionals who Nursetemps then refers to provide health care services to its clients, which include some of the nation's top hospitals, long term care facilities, and governmental or public institutions, such as correctional facilities and schools.   Nursetemps also provides home health care services through hospice organizations.  [12/10, pp. 11-12].

3.      Subsequent to its purchase of its travel Division, Healthforce, Nursetemps became accredited by the Joint Commission, f/k/a the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), as a part of that purchase.  [12/10, p. 35].

4.      Nursetemps' Florida operation is based out of Inverness, Florida, and is overseen by Mr. Arthur, the President and sole owner of Nursetemps, and Patti Myers ("Ms. Myers"), the Office Administrator and Vice President.  [12/10, p. 8; 12/11, p. 156].

5.      In accordance with Florida's nurse registry statute, Nursetemps classifies the RNs, LPNs, and other medical professionals providing services to Nursetemps' clients in the State of Florida as independent contractors.  [12/10, pp. 77-78, 156].

6.      Nursetemps previously had an office located in Dothan, Alabama, but that office closed prior to the filing of the DOL's Contempt Petition.  Cindy Moore ("Ms. Moore") was the Administrator for the Dothan office, and she reported directly to Mr. Arthur.  [12/10, pp. 9, 20; 12/12, p. 111].  Ms. Moore is no longer employed by Nursetemps.  [12/12, p. 111].

7.      Healthcare workers based out of the Dothan, Alabama office – who provided services only in the State of Alabama – were treated as employees instead of independent contractors, because the Alabama Department of Revenue advised Mr. Arthur that he could not treat healthcare workers as independent contractors, and Mr. Arthur complied with such advice.

---

[1] Respondents will reference citations from the trial transcript according to the date and page number.  For instance, testimony from December 10, 2012 will be cited as "12/10," with the page number to follow.

[12/10, p. 162].   Those healthcare workers were, therefore, paid overtime for any work they performed in the State of Alabama in excess of forty hours per workweek.

8.      Of the two witnesses who perform services in Alabama, both testified that employees were paid overtime.  Francis Davis ("Ms. Davis") testified that she was paid overtime for all hours worked over 40.  [12/12, p. 22, lines 13-16].  When asked, "Is it your understanding that all Alabama healthcare workers working in Alabama, if they worked over 40 hours in a week, were supposed to receive overtime pay?",  Ms. Moore responded: "Absolutely."

**B.     Overview Of The Lawsuit**

9.      On May 4, 2007, the DOL instituted a lawsuit against Respondents alleging that Respondents violated the overtime provisions of the Fair Labor Standards Act, 29 U.S.C. §201, *et seq.* ("FLSA"), by failing to pay healthcare workers one and one-half times their regular rate of pay for any hours worked in excess of forty hours per workweek. [Joint Pretrial Statement ("JPS"), Stipulated Fact ("Stip. Fact."), ¶ 1].

10.     Instead of engaging in lengthy litigation with the DOL, Respondents chose to reach a resolution with the DOL rather than potentially bankrupting the company to take the matter to trial.  [JPS, Stip. Fact, ¶ 2].

11.     As part of the resolution with the DOL, Respondents assented to entry of a Consent Judgment, in which Respondents agreed that "they shall not . . . employ any ***employee*** in commerce or in the production of goods for commerce, or in an enterprise engaged in commerce or in the production of goods for commerce, within the meaning of the [FLSA], for more than 40 hours in a workweek unless such employee is compensated for such hours in excess of 40 at  an overtime rate of at least one and one-half times the regular rate at which such employee is employed."  [JPS, Stip. Fact, ¶ 3] [emphasis supplied].

3

12.     Respondents further agreed to "make, keep, and preserve adequate and accurate employment records as prescribed by Regulation found at 29 C.F.R. § 516.2." [JPS, Stip. Fact, ¶ 4].

13.     This Court entered the Consent Judgment on November 25, 2008.  [JPS, Stip. Fact, ¶ 5] [Doc. 19].

14.     Respondents never agreed that the nurses who were performing services for Respondents were improperly classified as independent contractors.  [12/12, p. 118].

15.     The Consent Judgment does not indicate that nurses performing services for Respondents were employees.  [Doc. 19].

16.     In or around October 2010, the DOL began investigating "potential violations" of the Consent Judgment.  As part of that investigation, the DOL deposed Mr. Arthur, Ms. Myers, and Nursetemps' Payroll Manager, Aron Gustafson ("Mr. Gustafson").[2]  Over eighteen months later, on May 22, 2012, the DOL filed a Petition for Adjudication in Civil Contempt and For Enlargement of Judgment (the "Petition"), asserting that Respondents violated the Consent Judgment by failing to pay certain "healthcare workers" overtime, and by purportedly failing to keep "adequate and accurate employment records" for such healthcare workers.

17.     Respondents opposed the DOL's Petition and strongly deny that they have violated the Consent Judgment.

18.     A five-day bench trial was held in this matter from December 10 to 14, 2012.

---

[2]  The DOL also deposed the former Administrator of the Dothan, Alabama office, Ms. Moore.  However, Nursetemps' Alabama employees were not part of the lawsuit filed by the DOL and, thus, any testimony regarding such employees or the operation of the Alabama office is irrelevant to the instant case.

C.      **Nursetemps' Registration And Credentialing Process**

19.     Because Nursetemps is a licensed nurse registry, AHCA requires that it comply with very specific registration and credentialing regulations before referring any of its database of medical professionals to its clients to provide health care services.

20.     As part of the credentialing process required by AHCA, Nursetemps must verify a new independent contractor's licensure or certification with the issuing board or department, confirm the identity of the independent contractor prior to referral by verifying the individual's driver's license or other photo identification and social security card, and conduct a background screening.  [Ex. 17; 12/13, p. 126].

21.     Nursetemps must also confirm that the healthcare worker has the required skills to be referred for contract to Nursetemps' clients and does so by administering skills and proficiency tests.  [12/10, pp. 112-113].  These tests also provide Nursetemps with a competitive advantage by allowing Nursetemps to provide its clients with a healthcare worker who is prequalified with respect to experience and specializations.  [12/11, pp. 57-58].  In addition, Nursetemps must verify that a healthcare worker is certified in some form of basic life support. [Ex. 17].

22.     When A+ Nursetemps registers a healthcare worker to provide brokered services to its clients, it is required to disseminate the following rules and statutes to its prospective independent contractor, in compliance with AHCA Regulations: (1) a health and communicable disease statement, which indicates that the contractor is free from communicable disease; (2) a statement entitled "Registered Nurses and Licensed Practical Nurses," that advises healthcare workers that they are responsible for the clinical records of their patients, maintaining their medical plans of treatment (including any clinical notes necessary), and remaining under the direction of a registered nurse or physician licensed by the State of Florida; (3) a Medical Plan of Treatment policy, which sets forth specific requirements for implementing, maintaining, and

documenting each patient's medical plan of treatment; (4) a Clinical Records policy, that dictates the minimum information that an RN or LPN must include in the patient's file or chart; and (5) an Administration of Biologicals policy, that contains AHCA's rules governing the administration of drugs and biologicals to patients.  [59 F.A.C. §59A-18.005].  Respondents provided these documents to healthcare workers completing the application and credentialing process on-line, depending on which State they were seeking.  [12/12, pp. 118-20].

23.     Any candidate who registers his or her services to be brokered to Nursetemps' clients must sign an acknowledgement, entitled "State Rules Acceptance," stating that he or she has received and reviewed the above rules and statutes.  [59 F.A.C. §59A-18.005].  This acknowledgment is an AHCA requirement.

24.     As part of the registration process, Nursetemps, pursuant to AHCA Regulations, instructs its healthcare professionals that they are responsible for the payment of self-employment taxes.  [59 F.A.C. §59A-18.005].

25.     Nursetemps is further required by ACHA Regulations to maintain registration folders on each healthcare worker, which must contain, among other things, evidence of background screenings and a system for recording and following up on complaints from clients involving specific independent contractors.  [59 F.A.C. §59A-18.005].

26.     While it is not required to be certified by the Joint Commission, Respondents wish to be certified for various reasons, including the prestige of such certification.  [12/11, p. 73].  Additionally, having this certification opens up additional business opportunities for Respondents.  [12/11, p. 74].

27.     Like AHCA, the Joint Commission also requires Nursetemps to comply with certain policies and procedures to maintain its accreditation.  For example, Mr. Arthur testified that, although Nursetemps ceased to provide handbooks or policies to its contractors after the

Consent Judgment, Nursetemps still required the contractors to sign handbook acknowledgments because it is a Joint Commission requirement.

**D.**     **Nursetemps Did Not Exercise Control Over Healthcare Workers**

*Healthcare workers controlled if and when they worked*

28.     After healthcare workers become registered with Nursetemps, the healthcare workers ultimately retain complete control over their work schedules and can work as much or as little as they want.  [12/12, p. 68; 12/13, pp. 107, 127-128; 12/14, p. 4].  They are not required to work a specific number of hours per week, month, or year.  [JPS, Stip. Fact, ¶ 8; 12/13, pp. 106-107, 128; 12/14, p. 4].

29.     In fact, Lisa Ziegler ("Ms. Ziegler"), a current contractor of Nursetemps, testified that she lets Nursetemps know when she is available and where she would like to work.  [12/13, p. 127].  Ms. Ziegler further testified that she not only specifies the shift she wants to work, but she also specifies the facility where she wants to work.  [12/13, pp. 127-128].  When another current contractor of Nursetemps, Jennifer Black ("Ms. Black"), was questioned as to how it is decided when and where she will work, she similarly responded, "I decide."  [12/14, p. 4].  She stated that she prefers to work for hospice, and that she specifies the shifts she wants to work.  [12/14, p. 4].  No witness testified that they were required to work a particular day or shift by Respondents.

30.     Nursetemps does not have an attendance policy, and healthcare workers have the ability to accept or decline shifts without penalty.  [12/13, p. 106; 12/14, p. 6].  Indeed, healthcare workers do not need approval before taking time off or declining shifts for a prolonged period.  [JPS, Stip. Fact, ¶ 9; 12/14, pp. 5-6].  In fact, several healthcare workers, including James Hoover ("Mr. Hoover"), Ms. Ziegler, and Ms. Black, testified that they could refuse shifts from Nursetemps for several weeks and/or months at a time.

31.     Mr. Hoover, for example, stated that the longest period of time he did not accept a shift from Nursetemps was five months.  However, he was able to return to accepting shifts as soon as he wanted to do so, and was not penalized by Nursetemps in any way for his decision to take a prolonged leave of absence.  [12/13, p. 107].

32.     Similarly, Ms. Ziegler testified that there have been significant gaps of time when she has not accepted shifts from Nursetemps.  [12/13, p. 128].  In May and June 2011, she did not accept any shifts from Nursetemps, and there were periods of time after June 2011 where she did not accept shifts for a period of thirty days.  [12/13, p. 129].  Ms. Ziegler stated that she did not have to seek approval before taking that time off, and that she was not penalized in any way for doing so.  [12/13, p. 129].  She immediately began receiving shifts from Nursetemps as soon she asked for them.  [12/13, p. 129].

33.     Likewise, Ms. Black attested that she did not accept shifts from Nursetemps for a period of *three years*, and that there are other instances when she has not accepted shifts for at least one month at a time.  [12/14, p. 6].  However, she has never been reprimanded for not accepting shifts, and she is always able to return to accepting shifts when she wishes.  [12/14, p. 6].[3]

34.     Moreover, there are many instances where healthcare workers accept assignments for only one shift per week, or even one shift per month.  Indeed, the DOL's own witnesses, including Natosha Stephens ("Ms. Stephens") and Debra Walkes ("Ms. Walkes"), testified that there were months where they worked only a few shifts.  Ms. Stephens admitted that she did not

[3] Although the DOL presented Gail Abernethy ("Ms. Abernethy") and Melinda Disselhoff ("Ms. Disselhoff"), who testified that they believed they would be called less if they declined shifts, such testimony is not credible.  First, Ms. Abernethy was merely speculating as to the repercussions of declining a shift, because she admitted that she did not call off more than once or twice.  Moreover, other witnesses clearly testified they declined shifts and were offered shifts again without any issues when they chose to return.  Ms. Abernethy even admitted that there may be other reasons as to why an individual would not be offered a shift, such as low census.  [12/12, p. 63].  Secondly, Ms. Disselhoff testified that Nursetemps knew she was only accepting shifts for a temporary period during a break in her employment, and that Nursetemps did not care.  [12/12, pp. 97-98].  In fact, Ms. Disselhoff, in a signed statement for the DOL, stated that after she advised Nursetemps she was looking for other sources of income, Nursetemps provided her with additional shifts.  [12/12, p. 101].  Thus, it is illogical for Ms. Disselhoff to conclude that Nursetemps would penalize her for declining a shift.

8

accept any shifts from Nursetemps in the months of May to July 2010, and that she only worked two days in August 2010, six days in September 2010, four days in October 2010, and three days in November 2010.  [12/11, pp. 163-164, 168].  Ms. Walkes similarly testified that she only accepted shifts for two days in June 2012.  [12/11, p. 214].

35.     Even when healthcare workers initially accepted an assignment from Nursetemps, they could – without prior approval from Nursetemps – call another healthcare worker on its registry to replace them if they did not wish to work that particular shift.  Ms. Black acknowledged that, unlike her full-time employer, Nursetemps allowed her to change her shifts, without difficulty, and that "[i]t's just whatever she wanted to do."  [12/14, p. 5].

36.     In sum, the healthcare workers testified that they could refuse shifts at their own liberty – whether it was because they were working elsewhere, too tired, sick, taking vacation, or simply because they did not want the shift – and that they were never disciplined for their unavailability.  However, healthcare workers never received pay for days they did not work. [12/13, pp. 110-111; 12/14, p. 10].

37.     One potential disadvantage of working for a registry, such as Nursetemps, is that healthcare workers are not guaranteed a specific number of shifts per week.  [12/12, p. 104; 12/13, p. 107].  Furthermore, even after the healthcare worker accepted a shift, it was subject to cancellation by the facility and was not guaranteed.  [12/12, p. 15].  Nonetheless, various healthcare workers testified that the benefit of Nursetemps is the flexibility that it offers.

38.     Mr. Hoover explained that, although he received health benefits and paid time off with his full-time employer (which he does not receive with Nursetemps), his full-time employer assigned him a specific shift (the midnight shift) at a particular location (surgical intensive care), required him to work a certain number of hours per week and to seek prior approval before taking time off, and assigned him a supervisor who oversaw his job duties.  [12/13, pp. 120-121]. With Nursetemps, Mr. Hoover does not have a supervisor, and he may accept as many or as few

shifts as he wants, on whatever shift he prefers, at whichever location he desires, and he may take time off without approval.  [12/13, p. 107].

39.     Further, when Ms. Ziegler was asked why she likes working for agencies such as Nursetemps, she stated: "I work when I want to work, take where I want to go," which has not been her experience in working as an employee for employers in the field of nursing.  [12/13, p. 146].  Unlike Nursetemps, when Ms. Ziegler worked directly for a facility, she was assigned a shift and reported to a supervisor.  [12/13, pp. 146-147].  Ms. Ziegler stated that, when she worked for a facility, she was required to work a certain amount of hours, and that the facility made her schedule.  [12/13, p. 147].  In fact, she testified that she "rarely had a chance" to make her own schedule with a facility.  [12/13, p. 147].  The only advantage of working directly for a facility was that she received insurance benefits, which Ms. Abernethy also confirmed is a benefit of working directly for a facility.  [12/12, p. 75; 12/13, p. 147].

### *Nursetemps did not supervise healthcare workers or direct their job duties*

40.     Healthcare workers, including Mr. Hoover, Ms. Ziegler, and Ms. Black, clearly testified that Nursetemps exercises no control over their job responsibilities, and that any direction or instruction given to them is from the facility and/or client where they accept shifts, and not Nursetemps.  [12/13, pp. 108-109, 129-130; 12/14, p. 7].

41.     Healthcare workers also testified that, in performing their job duties and in determining which tasks to perform, they often rely on their experience in the field, in addition to the particular hospital or facility's plan of care.  [12/13, p. 108].

42.     Nursetemps never drafted the patient's plan of care, never instructed healthcare workers how to perform their jobs, and never visited the facilities where they accepted shift work while they were on duty.  [12/13, pp. 108-109, 129-130; 12/14, p. 7].

43.     Healthcare workers attested that they did not have a supervisor at Nursetemps to whom they reported.   [12/13, pp. 147-148; 12/14, p. 7].   Notably, Ms. Ziegler testified as follows:

> Q.     Is Mr. Arthur your boss at Nursetemps?
> A.     Not really.
> Q.     Does he tell you what to do?
> A.     No.
> Q.     Who tells you what to do?
> A.     I do.

[12/13, pp. 147-148].

44.     Healthcare workers further attested that they are not given any performance reviews by Nursetemps itself.   [12/13, p. 130].   To the extent the healthcare workers are evaluated, such evaluations are required by AHCA and the Joint Commission, and the facility where the healthcare worker is assigned conducts the evaluation.   [12/10, p. 112; 12/11, pp. 59-60].

45.     In addition, Nursetemps exercises no control over healthcare workers' dress or appearance at the facilities where they accept shifts.   [12/13, pp. 108, 130; 12/14, p. 7].   Unless the facility requires a specific uniform, healthcare workers are free to choose their own uniform. Mr. Hoover testified that, although Nursetemps does not tell him what to wear to work, he prefers to "dress professionally."   [12/13, p. 108].

46.     Moreover, Nursetemps never disciplines the healthcare workers for any reason. [12/13, pp. 108, 130; 12/14, p. 8].   If a healthcare worker receives a "do not return" ("DNR") from a facility, Nursetemps simply notates this in the healthcare worker's file, as required by AHCA, but does not discipline the worker because of this incident.   Nursetemps will just continue to offer the DNR'd worker shifts at other facilities.   [12/11, p. 47].

47.     Despite the plethora of evidence demonstrating that Nursetemps lacks control over healthcare workers, the DOL has attempted to assert that Nursetemps exerted control over

healthcare workers by allegedly requiring that healthcare workers: (a) show up fifteen minutes in advance of their assigned shifts; (b) call Nursetemps if they are running late for a shift; (c) notify Nursetemps at least two hours in advance of cancelling a shift; (d) wait for their replacement before leaving their shift; and (e) wear a name tag.  However, the DOL's efforts to establish that Nursetemps exerted control over healthcare workers is directly contradicted by the testimony of several healthcare workers who clearly indicate that such requirements are either ***facility requirements*** or basic nursing concepts, and ***not*** requirements of Nursetemps itself.

48.     For instance, both Cathy Petty ("Ms. Petty) and Ms. Stephens – witnesses called by the DOL – testified that it is a facility requirement that they show up fifteen minutes in advance of their shifts.  [12/11, pp. 129, 149].  Ms. Petty further testified that this is also an "unwritten rule in the profession."  [12/11, p. 138].

49.     When asked whether Nursetemps requires healthcare workers to provide a specific amount of notice before cancelling a shift, Ms. Petty similarly testified that providing two hours' notice prior to cancelling a shift is "just a given," because you do not wait until the last minute to cancel in nursing.  [12/11, p. 131].

50.     Moreover, contrary to the DOL's representation that Nursetemps had a "policy" prohibiting healthcare workers from directly contacting the facility, both Ms. Petty and Ms. Walkes testified that they called the facilities if they were late for a shift.  [12/11, pp. 130, 208].

51.     The DOL's healthcare worker witnesses further explained that it is not a specific requirement of Nursetemps that they must wait for a replacement before leaving their shift. Instead, Ms. Stephens and Jo Carol Ford ("Ms. Ford") testified that the Board of Nursing prohibits healthcare workers from abandoning a patient in need, and that their failure to wait for a replacement may cost them their license.  [12/11, pp. 150-151, 162, 187-188].

52.     Finally, it is clear from Ms. Stephens' and Ms. Abernethy's testimony that ***state law*** requires healthcare workers to wear a name tag identifying themselves and the entity for

which they work.  [12/11, pp. 152, 170; 12/12, p. 73].  The testimony of Ms. Stephens and Ms. Myers also supports that state law requires that healthcare workers identify themselves to patients.  [12/10, p. 120; 12/11, p. 170].

E.      **Healthcare Workers Controlled Their Profits And Losses**

53.      The vast majority of those giving testimony at trial indicated that healthcare workers have the ability to negotiate their own pay rate with Nursetemps if they choose to do so. Indeed, Ms. Petty explained that she successfully negotiated a higher hourly rate for herself.  In addition to accepting shifts from Nursetemps, Ms. Petty testified that she also accepted shifts from another agency, which paid $4.00 or $5.00 more per hour than Nursetemps.  When Nursetemps inquired as to whether she wanted to take more shifts, Ms. Petty advised Mr. Arthur that he needed to pay her at least what she received per hour from the other agency.  Not only did Mr. Arthur agree to do so, he raised her pay rate above the other agency's rate.  [12/11, pp. 129-130].  With regard to those healthcare workers who did not negotiate or receive different rates, it is clear from the testimony that this was as a result of the choice of the healthcare worker, not because of any practice of Respondents.  Accordingly, it has been established that such healthcare workers had the ability to negotiate and, on many occasions, did negotiate different rates for providing services through Respondents.  To illustrate, Ms. Davis testified that she had the ability to negotiate her pay rate.  [12/12, p. 11].  However, she was ultimately unsuccessful in doing so because she failed to follow up with Nursetemps' Administrator, Ms. Myers.  [12/12, p. 25]. Additionally, Ms. Black testified that, although she has not negotiated her pay rate with Nursetemps, she understands that she has the ability to do so.  [12/14, p. 21].  She explained that if she accepted shifts from a hospital, she would ask for more money, but that she prefers to work for hospice where she does not perform much work, so she's "okay with what hospice contracts with … or asks for."  [12/14, p. 21].

13

54.     Several nurses also explained that they control how much they earn by deciding where they want to accept shifts.  For example, correctional facilities often pay more than hospice organizations.  [12/11, pp. 192-193, 197].

55.     Further, by choosing a facility closer to where the healthcare worker lives, that individual can maximize profit by reducing transportation costs.

56.     Healthcare workers also choose how often they wanted to be paid – they have the option of being paid on a daily or weekly basis.  [12/13, pp. 111, 113].

57.     Another way that healthcare workers control how much they earn is by seeking opportunities for lower cost CEUs to increase the net amount of money they take home.  [12/13, p. 111].

58.     Additionally, healthcare workers could possibly obtain more shifts by "marketing themselves" to the facilities where they worked and the schedulers at Nursetemps.  [12/12, p. 62].

F.     **Healthcare Workers Were Required To Invest Their Own Resources To Perform Their Job**

59.     Nursetemps has never made any investment in their healthcare workers, aside from Nursetemps' marketing efforts to initially recruit healthcare workers to sign up on its registry.  [12/11, pp. 23-24].

60.     Healthcare workers consistently testified that they are financially responsible for renewing their licenses and obtaining their continuing education credits ("CEU").  [12/13, pp. 109-110, 131; 12/14, pp. 8-9].  Nursetemps never reimburses healthcare workers for such expenses.  [12/13, pp. 109-110; 12/14, p. 9].

61.     Healthcare workers are responsible for purchasing any equipment they need to complete their assignments, including but not limited to blood pressure monitors and cuffs, stethoscopes, thermometers, and uniforms.  [12/11, pp. 127, 185-186; 12/12, p. 49; 12/13, pp. 109, 131; 12/14, p. 8].  Nursetemps never purchases any equipment for healthcare workers and

never reimburses them for any equipment that they purchase.  [12/13, pp. 109, 131; 12/14, p. 8].

62.    Ms. Abernethy testified that while she accepted shifts with Nursetemps, she had to provide bandages, incontinence medications, and supplies for IVs when she worked shifts for hospice.  However, unlike Nursetemps, her current employer provides those supplies, which is an advantage of working for a facility.  [12/12, p. 72].

63.    In addition, healthcare workers are required to provide their own transportation to work and are not reimbursed by Nursetemps for fuel or mileage.  [12/13, p. 108].

## G.    Healthcare Workers Possess Highly Specialized Skills

64.    Most of the healthcare workers who testified at the trial, with the exception of Ms. Black (who is an RN), attested that they are certified as LPNs.  Mr. Hoover testified that to become an LPN, he had to attend a full-time, thirteen month licensing program.  [12/13, p. 103].  As part of this licensing program, Mr. Hoover explained that he was required to participate in clinical rotations.  [12/13, p. 104].  After graduating from the full-time licensing program and obtaining his diploma in Practical Nursing, Mr. Hoover testified that he was required to take a state board exam to obtain his license, which he must renew every two years.  As a prerequisite to renewing his license, Mr. Hoover stated that he has to take continuing education classes, which are referred to in the industry as "CEUs."  [12/13, pp. 104-105].

65.    Mr. Hoover further testified that, as an LPN, he is required to be certified in CPR, and that he also has a certification in advanced cardiac life support.  [12/13, p. 105].

66.    Ms. Ziegler, another LPN, confirmed Mr. Hoover's account of the education and skill required to practice as an LPN.  [12/13, p. 125].

67.    Ms. Petty – the DOL's witness – testified that she even took extra courses, including advanced cardiac life support, intravenous therapy, and basic arrhythmia, to be able to work in specialty areas, such as critical care.  [12/11, p. 128].  Ms. Petty believes that these additional courses made her a more skilled professional and, in turn, more valuable:

> Q.   And by being a better skilled professional at your own expense, you felt that you were more valuable in the workforce, correct?
>
> A.   That's correct.
>
> Q.   And did it turn out that you're more valuable based on the additional skills you paid for?
>
> A.   I believe so.

[12/11, p. 137].

68.   Ms. Petty further acknowledged that, if she had worked for a facility, the facility would have paid for these courses, but that she had to pay for them herself, as she chose to work for a nurse staffing agency at the time.  [12/11, p. 129].

## H.   There Is No Degree Of Permanency In The Healthcare Workers' Relationships With Nursetemps

69.   Healthcare workers listed on Nursetemps' registry are allowed to and, in fact, work for other staffing agencies and employers while also providing services on behalf of Nursetemps.  [JPS, Stip. Fact, ¶ 10; 12/13, p. 111].  For instance, Mr. Hoover testified that he has accepted shifts from other staffing agencies while also accepting shifts from Nursetemps, and that it is not a problem.  [12/13, p. 105].  Ms. Ziegler also testified that she worked for Superior, which is another staffing agency, while also accepting shifts from Nursetemps.  [12/13, p. 124].

70.   Similarly, Ms. Ford, a witness who testified on behalf of the DOL, stated that she accepted shifts from two other staffing agencies, Nurse Source and CMS, while also accepting shifts from Nursetemps.  [12/11, pp. 173-174].  Although another DOL witness, Ms. Abernethy, testified that she did not work for any other agencies while accepting shifts from Nursetemps because she is "loyal" to one company, she admitted that she had the right to work for other agencies or employers if she chose to do so.  [12/12, p. 66].   Likewise, Ms. Walkes (also a DOL witness) understood that she could have worked for other agencies while also accepting shifts from Nursetemps, and stated that Nursetemps did not prevent her from going to work for Suwannee Medical, another nursing agency.  [12/11, pp. 214-215].

71.     Healthcare workers, including Mr. Hoover and Ms. Ziegler, acknowledged that Nursetemps does not prohibit them from working directly for a facility if they choose. [12/13, pp. 112, 133]. Notably, Melinda Disselhoff testified that, after she stopped accepting shifts from Nursetemps, she immediately went to work for a facility – Brookdale Senior Living – where she had previously accepted shifts through Nursetemps.

72.     Moreover, Ms. Davis testified that, in addition to working for Nursetemps, she worked for Laurel Oaks, an adolescent behavioral health facility, and that she had no issues doing so. [12/12, pp. 7, 30]. Although Ms. Davis testified that, based upon what she heard from her supervisor at the Department of Corrections, she believed there was a 90-day waiting period before she could work directly for the Department of Corrections, Nursetemps ultimately did not prevent her from doing so, nor did Nursetemps prevent her from seeking other work. [12/12, pp. 8, 31, 38]. Ms. Davis explained that she chose to pursue employment with the Department of Corrections because the shifts were more guaranteed than with Nursetemps, where she experienced several cancellations. [12/12, p. 40]. For example, when accepting shifts at the Department of Corrections through Nursetemps, these shifts were subject to being "destaffed," meaning that even after she accepted a scheduled shift she was not guaranteed to be able to work that shift. [12/12, p. 15].

73.     Ms. Stephens also testified that her shifts at correctional facilities were frequently canceled. [12/11, pp. 164-65]. However, Ms. Stevens did not know why those shifts were canceled. [12/11, pp. 164-65]. Indeed, there were months when she did not work any shifts through Respondents and worked very few days during the months from February 2010 through December 2010. [12/11, pp. 163-68].

74.     Healthcare workers also retain the right to terminate their affiliation with Nursetemps at any time without any prior notice; they can simply stop seeking and/or accepting assignments from Nursetemps. [12/13, p. 112; 12/14, p. 11]. Ms. Black testified that she is not

17

economically dependent on Nursetemps and understands that if she declines a shift, there are other nurses available to fill Nursetemps' needs.  [12/14, p. 11].

**I.**     **Miscellaneous Factors**

75.     Healthcare workers in Florida are responsible for paying their own income taxes, and they receive a 1099 form from Nursetemps.  [12/13, pp. 110, 132; 12/14, p. 9].

76.     Nursetemps does not make any Social Security or Medicare contributions on behalf of healthcare workers in Florida.  [12/13, pp. 110, 132; 12/14, p. 9].

77.     On the contrary, Alabama healthcare workers received a W-2 for the work they performed in the State of Alabama, and were subject to state and federal tax withholdings.

78.     Healthcare workers are also responsible for obtaining their own health insurance benefits.  In fact, healthcare workers are not eligible for any benefits with Nursetemps, including but not limited to health insurance, a 401(k) plan, long-term disability insurance, or life insurance.  [12/13, pp. 110, 132; 12/14, pp. 9-10].

**J.**     **Nursetemps' Efforts To Comply With The Consent Judgment**

79.      The Consent Judgment did not require Respondents to change the classification of any healthcare worker. Accordingly, Mr. Arthur set about to ascertain how he could legitimately treat healthcare workers as independent contractors.  Based upon the information he received from the Department of Labor and others, he made several changes, including: removing the non-compete clause from Respondent's Independent Contractor Agreement [12/11, pp. 50-54]; making clear that healthcare workers were permitted to work for other agencies while simultaneously working through Respondents' agency [12/11, pp. 54-55]; leaving the orientation process up to the facilities [12/11, pp. 58-59]; maintaining relationships with a larger array of facilities to enable Respondents to permit healthcare workers diverse choices in selecting one or more facilities that met the needs or desires of that healthcare worker [12/11, pp. 60-62]; placing no restrictions on healthcare workers' hours, shifts, or preferences of work sites [12/11, pp. 60-

64]; permitting nurses who care to negotiate the opportunity to negotiate rates [12/11, pp. 64-67]; and allowing nurses to work directly for facilities even after they have been placed at those facilities through Respondents.  [12/11, pp. 67-70].

80.     Further, upon discovering that healthcare workers had continued to work overtime hours after entry of the Consent Judgment, Mr. Arthur decided to add an additional layer or protection by requiring that healthcare workers incorporate or form a limited liability company if they wanted to work in excess of forty hours per workweek.  Mr. Arthur testified that he believed this was a viable option because Jerry Sexsmith ("Mr. Sexsmith"), a former DOL investigator, had advised him that Nursetemps would not have any issues with the FLSA if the healthcare workers were to incorporate.  [12/11, pp. 50-54].

81.     Although Mr. Sexsmith testified that he did not recall advising Mr. Arthur that the DOL would be satisfied if the healthcare workers incorporated, such testimony is not persuasive because Mr. Sexsmith could not recall any other conversation that he had with Mr. Arthur.  If anything, Mr. Arthur's recollection of Mr. Sexsmith's advice simply demonstrates his motive for having workers incorporate.

## II.

## PROPOSED CONCLUSIONS OF LAW

A.     **Standard For Civil Contempt**

82.     Civil contempt is defined as "willful disregard of the authority of the Court." *Georgia Power Co. v. N.L.R.B.*, 484 F.3d 1288, 1291 (11th Cir. 2007).

83.     The party seeking an order of contempt bears the initial burden of proving its *prima facie* case by clear and convincing evidence.  *Id.*; *see also Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (11th Cir. 2002); *Chairs v. Burgess*, 143 F.3d 1432, 1436 (11th Cir. 1998).

84.     A petitioner's clear and convincing evidence "must [first] establish that an order was violated."  *S.E.C. v. Pension Fund of America, L.C.*, 396 Fed. Appx. 577, 580 (11th Cir.

2010) (citing *Jove Eng'g v. I.R.S.*, 92 F.3d 1539, 1545 (11th Cir. 1996)).   The clear and convincing evidence must further establish that: (1) the allegedly violated order was valid and lawful; (2) the order was clear and unambiguous; and (3) the alleged violator had the ability to comply with the order.  *Id.*

85.     The petitioner's burden to prove its *prima facie* case by "clear and convincing evidence" is "more exacting than the 'preponderance of the evidence' standard but, unlike criminal contempt, does not require proof beyond a reasonable doubt." *Georgia Power Co.*, 484 F.3d at 1291 (citing *Jordan v. Wilson*, 851 F.2d 1290, 1292 (11th Cir. 1988)).   The party seeking the contempt citation retains the ultimate burden of proof.  *Combs v. Ryan's Coal Co., Inc.*, 785 F.2d 970, 984 (11th Cir. 1986).

86.     If the petitioner can establish a *prima facie* showing of a violation, the **burden of production** then shifts to the alleged contemnor "to produce evidence explaining his noncompliance" at a "show cause" hearing.  *Pension Fund of America, L.C.*, 396 Fed. Appx. at 580 (citing *Howard Johnson, Inc. v. Khimani*, 892 F.2d 1512, 1516 (11th Cir. 1990)) (emphasis added); *Chairs*, 143 F.3d at 1436 (citing *Citronelle-Mobile Gathering, Inc. v. Watkins*, 943 F.2d 1297, 1301 (11th Cir. 1991)).

87.     At the show cause hearing, the purported contemnor is "allowed to show either that he did not violate the court order or that he was excused from complying."  *Chairs*, 143 F.3d at 1436 (citing *Mercer v. Mitchell*, 908 F.2d 763, 768 (11th Cir. 1990)).

88.     **A party attempting with reasonable diligence to comply with the court order should not be held in contempt**.  *Newman v. Graddick*, 74 F.2d 1513, 1525 (11th Cir. 1984) (emphasis supplied).   "Conduct that evinces substantial, but not complete, compliance with the court order may be excused if it was made as part of a good faith effort at compliance."  *Id.* at 1524.

20

**B.     The DOL Has Failed To State A *Prima Facie* Case Of Civil Contempt**

89.     As a threshold matter, both parties in the instant case appear to agree that the Consent Judgment is a valid and lawful order, and that it is unambiguous.  However, the parties clearly have differing interpretations of what is actually required by the terms of the Consent Judgment.  The DOL asks this Court to find that the Consent Judgment requires Respondents to treat all of its workers as employees rather than independent contractors, whereas Respondents maintain that the Consent Judgment only requires that they comply with the FLSA.

90.     However, to make the finding the DOL proposes would require the Court to add language to the Consent Judgment that simply is not there.  The Eleventh Circuit applies the same rules that govern contract interpretation when interpreting a consent decree, "because a consent decree is essentially a form of contract."  *Reynolds v. Roberts*, 202 F.3d 1303, 1312-13 (11th Cir. 2000).  Since a decree is the sole source of the parties' rights, a district court may not impose obligations that are not unambiguously mandated by the decree itself.  *United States v. Armour & Co.*, 402 U.S. 678, 681-82 (1971).

91.     "Because the defendant has, by the decree, waived his right to litigate the issues raised, a right guaranteed to him by the Due Process Clause, the conditions upon which he has given that waiver must be respected, and the instrument must be construed as it is written, and not as it might have been written had the plaintiff established his factual claims and legal theories in litigation."  *Id.*  Moreover, the court must construe any ambiguities or uncertainties in a court order in a contempt proceeding in a light favorable to the person charged with contempt.  *Georgia Power Co. v. N.L.R.B.*, 484 F.3d 1288, 1291 (11th Cir. 2007).

92.     Here, Respondents are correct in that the Consent Decree merely requires Respondents to follow the law – that is, to pay its ***employees*** in accordance with the provisions of the FLSA and to follow the recordkeeping requirements of the FLSA for those employees.  The Consent Judgment is entirely silent as to whether the healthcare workers who provide services to

Nursetemps' clients are properly classified as independent contractors, or whether Respondents are even permitted to have independent contractors.

93.     Accordingly, this Court must now examine whether Respondents have complied with the FLSA by classifying healthcare workers as independent contractors.  In doing so, the record evidence establishes that Defendants have properly classified the "healthcare workers" as independent contractors pursuant to Florida's Nurse Registry Act and the economic realities test analysis and, thus, the DOL has failed to establish a *prima facie* case of contempt by clear and convincing evidence.

94.     Although Petitioner seeks to have this court rule upon a group of approximately 150 employees who are allegedly owed overtime, the government presented testimony from only a handful of such employees, including its cross-examination of Respondents' witnesses. Petitioner failed to demonstrate similarity between even the few witnesses who testified. Accordingly, this Court cannot find that Petitioner demonstrated by clear and convincing evidence whether those listed who did not testify can properly be characterized as employees.

### *The Florida Legislature has dictated that "Healthcare Workers" referred for work by nurse registries are to be classified as independent contractors*

95.     The statutory definition of a "nurse registry" (which includes Nursetemps) unmistakably prescribes that medical professionals – or using the DOL's terminology, "health care workers" – providing brokered services to nurse registries' clients shall be classified as independent contractors.  Section 400.462(2), Florida Statutes, defines a nurse registry:

> "Nurse registry" means any person that procures, offers, promises, or attempts to secure health-care-related contracts for registered nurses, licensed practical nurses, certified nursing assistants, home health aides, companions, or homemakers, ***who are compensated by fees as independent contractors***, including but not limited to, contracts for the provision of services to patients and contracts to provide private duty or staffing services to health care facilities . . . or other business entities.

[Emphasis supplied].

96.     Section 400.506(6)(a), Florida Statutes, further highlights that individuals

providing services to nurse registries are to be classified as contractors, and not employees:

> A nurse registry *may refer for contract* in private residences registered
> nurses and licensed practical nurses . . . certified nursing assistants . . .
> home health aides . . . and companions or homemakers . . . .  A licensed
> nurse registry shall ensure that each certified nursing assistant *referred for
> contract* by the nurse registry and each home health aide *referred for
> contract* by the nurse registry is adequately trained to perform the tasks of a
> home health aide in the home setting . . . .

[Emphasis supplied].

97.     Not only has the Florida Legislature deemed that "healthcare workers"

providing services to nurse registries' clients be classified as independent contractors, AHCA,

the licensing entity for nurse registries, has repeatedly identified in its Regulations that those

who provide health care-related services brokered through nurse registries are independent

contractors.   For instance, as set forth above, Section 59A-18.005(2) of the Florida

Administrative Code, promulgated by AHCA, requires that each nurse registry *shall* "establish

written procedures for the selection, documentation, screening, and verification of credentials *for

each independent contractor* referred by the registry."   [§59A-18.005(2), F.A.C.] [emphasis

supplied].

98.     As another example, Section 59A-18.005(3)-(5) mandates that a nurse registry,

such as  Nursetemps, (a) "confirm *a new independent contractor's* licensure or certification with

the issuing board or department;" (b) "at least annually, reconfirm the licensure or certification

of all of its *independent contractors* who are licensed or certified;" and (c) "confirm the identity

of the *independent contractor* prior to referral," by verifying the individual's driver's license or

other photo identification.  [§59A-18.005(3)-(5), F.A.C.] [emphasis supplied].

99.     Moreover, Section 59A-18.005(7) of AHCA's Regulations instructs nurse

registries to advise their independent contractors that they are responsible for the payment of

self-employment estimated taxes, and Section 59A-18.005(8) of the Florida Administrative Code

provides that nurse registries must also maintain registration folders on each independent contractor, that contain, among other things, evidence of background screening and a system for recording and following up on complaints involving specific independent contractors. Accordingly, Nursetemps' classification of the healthcare professionals providing shift-work services as independent contractors is consistent with – and in accordance with – the rules set forth by the Florida Legislature and A+ Nursetemps' licensing entity, AHCA.

### *The DOL has not demonstrated by clear and convincing evidence that Defendants' "Healthcare Workers" were "employees" of Nursetemps under the economic realities analysis*

100.    There is no evidence whatsoever to support the DOL's allegations that such "healthcare workers" were "employees," rather than "independent contractors." The FLSA generally requires employers to pay their "employees" time and one-half for any hours worked over forty hours per week. *Murray v. Playmaker Services, LLC*, 512 F. Supp. 2d 1273, 1276 (S.D. Fla. 2007) (citing 29 U.S.C. §207(a)(1)). However, the rights afforded to employees under the FLSA do not apply to independent contractors. *See id.* Courts must therefore determine whether, as a matter of "economic reality," an individual is an "employee," who is afforded the protections of the FLSA, or an "independent contractor," who is not. *Id.* (citing *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 728 (1947)).

101.    The FLSA defines an "employee" as "any individual *employed* by an employer." 29 U.S.C. §2031(e)(1). To "employ" is defined under the FLSA as "to suffer or permit to work." 29 U.S.C. §203(g). The Eleventh Circuit has held that "an entity 'suffers or permits' an individual to work if, as a matter of economic reality, the individual is dependent on the entity." *Berrocal v. Moody Petroleum, Inc.*, 2009 WL 455448 (S.D. Fla. Feb. 22, 2009) (citing *Antenor v. D & S Farms*, 88 F.3d 925, 929 (11th Cir. 1996)).

102.    Determining whether an individual is an employee or an independent contractor does not depend on isolated factors; the determination is based on the "underlying economic

realities" as exposed by the "circumstances of the whole activity." *Rutherford Food Corp. v. McComb*, 331 U.S. 722, 727, 730 (1947). A plaintiff's subjective belief that he or she was an "employee" of the defendant for purposes of the FLSA is immaterial, as "the legal relation of [the] parties does not depend upon what they say it was." *Eighty Four Lumber v. Bethel*, 544 So. 2d 1094 (Fla. 1st DCA 1989) (citation omitted).

103.    Instead, the Eleventh Circuit analyzes the following factors in applying the economic realities test to determine whether an individual is an employee versus an independent contractor:

> (1) the nature and extent of the alleged employer's control as to the manner in which the work is to be performed;
> (2) the alleged employee's opportunity for profit or loss based upon her skill level;
> (3) the alleged employee's investment in equipment or materials required for her tasks, or her employment of other workers;
> (4) whether a special skill is required to complete the job;
> (5) the degree of permanency and duration of the working relationship; and
> (6) how integral the employee's job is to the employer's business.

*Freund v. Hi-Tech Satellite, Inc.*, 185 Fed. Appx. 782, 783 (11th Cir. 2006); *see also Parrilla v. Allcom Construction & Installation Serv., LLC*, 2009 WL 2868432, at *2 (M.D. Fla. Aug. 31, 2009) (same).

104.    These factors are to be used as a guide; the existence or absence of any one factor is not dispositive. *Parrilla*, 2009 WL 2868432, at *2. As such, these factors allow the "economic reality rather than the 'technical concepts' to be the test of employment." *Murray*, 512 F. Supp. 2d at 1277 (quoting *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33, 81 S.Ct. 933 (1961)).

105.    Indeed, "the final and determinative question must be whether the total of the testing establishes the personnel are so dependent upon the business with which they are connected that they come within the protection of FLSA or are sufficiently independent to lie outside its ambit." *Sandoval v. Fla. Paradise Lawn Maintenance, Inc.*, 2008 WL 1777392, at *3 (S.D. Fla. April 17, 2008). The weight of each factor depends on the light it sheds on the putative

employee's dependence on the alleged employer, which in turn depends on the facts of the case. *Freund*, 185 Fed. Appx. at 782-83.

106.    At least one case within Florida discusses the relationship between a nurse and an employment agency, which the court referred to as a "nurse registry."  *See Robison v. Faine*, 525 So.2d 903 (Fla. 3d DCA 1987).[4]  In *Robison*, the court analyzed whether a nurse who provided her services to a hospital through a nurse registry was an "employee" or "independent contractor" of the registry:

> According to the evidence, the Registry is an employment agency which does little more than list available attendants. [The plaintiff], like others listed with the service, did not have an exclusive relationship with the Registry.  She had the right to list her name with other registries, and was under no obligation to take any assignment.  [The plaintiff] was paid by her patient, who had the power to dismiss her.  The Registry withheld neither taxes nor social security and provided no medical or health benefits.
>
> Control is a crucial factor in determining the existence of an independent contractor or an employee relationship.  [The plaintiff] testified that the Registry exercised no control over the manner in which she performed her duties . . . [The plaintiff] was an independent contractor and not, as [the plaintiff] suggests, an employee of the Registry.

*Robison*, 525 So. 2d at 906 (internal citations omitted).[5]

107.    Here, the totality of the circumstances shows that Respondents' "healthcare workers" are independent contractors because they are not so dependent on Nursetemps to come within the protections of the FLSA.  Similar to the nurse in *Robison*, the "healthcare workers" at issue do not have an exclusive relationship with Nursetemps, have no obligation to accept

---

[4] The *Robison* court refers to the employment agency as a nurse registry, but there is no discussion as to whether such agency was a licensed nurse registry under the Florida Statutes. Here, the distinction is more clearly defined because Nursetemps is a licensed nurse registry and the healthcare professionals for whom it acts as a broker to its clients are more clearly treated as true independent contractors.

[5] In a similar context where a placement or staffing agency has located work for an individual, the court has also held that such arrangement did not constitute an employer-employee relationship. *See Freedom Labor Contractors of Florida, Inc. v. State, Div. of Unemp. Comp.*, 779 So.2d 663, 665 (Fla. 3d DCA 2001) (reversing determination that temporary laborer was employee of staffing agency, where staffing agency "had no direct control over the details or the mode of [the laborer's] work," and was "not shown to be directly involved in directing or supervising these laborers in their work performance.").

assignments from Nursetemps, and submit IRS form 1099s for tax purposes.  In addition, these "healthcare workers" are not subject to Social Security or Medicare Withholdings, and do not receive fringe benefits.  Accordingly, this Court, as explained more specifically below, finds that, because the healthcare workers who provide services to Nursetemps' clients are independent contractors, Respondents have fully complied with the FLSA and, therefore, have not violated the Consent Judgment.

### *Defendants do not control the manner in which "healthcare workers" perform their work*

108.     Regarding the first factor, the nature and degree of control over the alleged employee, courts have held that: "Control is only significant when it shows an individual exerts such control over a meaningful part of the business that she stands as a separate economic entity." *Berrocal*, 2009 WL 455448, at *6; *Molina v. S. Fla. Express Bankserv. Inc.*, 420 F. Supp. 2d 1276, 1285 (M.D. Fla. 2006).  Thus, "in evaluating this factor, courts have examined whether workers may choose how much and when to work . . . whether they must wear uniforms, and how closely their work is monitored and controlled by the purported employer." *Berrocal*, 2009 WL 455448, at *6; *Molina*, 420 F. Supp. 2d at 1284-1285.

109.     In the instant case, the healthcare workers consistently testified that they ultimately retain complete control over their work schedules, and that they can accept as many or as few shifts from Nursetemps as they desire.  They are also free to work for other nurse registries or facilities, and several giving testimony in fact worked for others in addition to providing services for Nursetemps.  Further, healthcare workers are able to take time off without approval.  Several healthcare workers even testified that they have taken prolonged periods of time off – up to three years – without any penalty whatsoever.   The record evidence demonstrates that the healthcare workers are not required to work a certain number of hours per week, month, or year, and are not guaranteed a specific number of hours by Nursetemps.  While some healthcare workers chose to work primarily through Nursetemps, this was just that – a

choice.  The record evidence demonstrates that each of the nurses giving testimony understood there was no guaranteed number of shifts or hours. This also precludes a finding that they are economically dependent upon Nursetemps, as discussed below.

110.    Moreover, the healthcare workers' testimony clearly shows that Nursetemps exerts no control over the manner in which the healthcare workers carry out their job duties. Any instruction or direction is given by the facility where the workers are assigned.  Healthcare workers are allowed to choose their own uniform, so long as there is no facility-specific uniform. However, Nursetemps in no way dictates what uniform healthcare workers are to wear. Healthcare workers in Florida are not assigned a supervisor at Nursetemps, and are not evaluated by Nursetemps.  To the extent any evaluations take place, it is an AHCA and Joint Commission requirement, which is conducted by the facility and, thus, does not defeat a finding that the healthcare workers are independent contractors.

111.    These facts weigh strongly in favor of independent contractor status.  *Compare Murray v. Playmaker Servs., LLC*, 512 F. Supp. 2d 1273, (S.D. Fla. 2007) (holding that "control" factor indicated that sales representative was independent contractor where she set her hours, decided who to cold call, decided where and when to arrange meetings, and could even structure her job around second job as a nurse) *with Parrilla v. Allcom Constr. & Installation Servs., LLC*, No. 6:08-cv-1967, 2009 WL 2868432, at *2-3 (M.D. Fla. Aug. 31, 2009) (J. Presnell) (holding that "control" factor weighed in favor of employer/employee relationship where defendant controlled plaintiff's daily work schedule, the type of work plaintiff performed, the amount of time plaintiff could take off from work, the manner in which plaintiff carried out his work, and supervised plaintiff's work).

112.    Indeed, courts have recognized the existence of independent contractor relationships where companies exerted far more "control" over workers than Nursetemps has in this case. *See Freund*, 185 Fed. Appx. at 783 ("control" factor weighed in favor of independent

contractor status where cable installers determined day to day work habits, work hours, and work methods, even though defendant required cable installers to (1) obtain approval before providing additional services, (2) wear provided t-shirt during appointments, (3) follow certain minimum specifications for installations, and (4) call defendant to confirm installations were complete and report problems); *Scantland v. Jeffry Knight, Inc.*, No. 8:09-cv-01985, 2012 WL 1080361, at *15 (M.D. Fla. Mar. 29, 2012) (J. Kovachevich) ("control" factor weighed in favor of finding that plaintiffs were independent contractors even though defendant "[c]lose[ly] monitor[ed] cable installers' progress and location through communication with dispatch and penalized workers for failing to meet quality control standards."); *Carrell v. Sunland Constr., Inc.*, 998 F.2d 330, 332-33 (5th Cir. 1993) ("control" factor weighed in favor of independent contractor status even though defendant dictated days and hours worked by pipe welders and maintained time records).

113.    The DOL's efforts to show that Nursetemps exerted control over these workers fall short of the legal requirements. All requirements the DOL claims were imposed by Nursetemps, such as arriving fifteen minutes before a shift, waiting for a replacement before leaving a shift, and wearing a name tag, are either common rules of the profession or state-specific laws.  None of these were imposed by Respondents.

114.    Even if Nursetemps required healthcare workers to arrive at client facilities fifteen minutes prior to the start of their shifts or to notify the company if they accepted additional shifts, such activity does not defeat a finding of independent contractor status.  *See Scantland*, 2012 WL 1080361, at *14 ("Requiring approval for additional work connotes a typical contractor/client relationship rather than an employer/employee relationship."); *DeSouza v. EGL Eagle Global Logistics*, 596 F. Supp. 2d 456, 466 (D. Conn. 2009) ("Even independent contractors, although 'independent' in name, are required to keep to a schedule. The fact that an independent contractor is required to be at a job or at a facility at a certain time does not eliminate his status as an independent contractor.")

115.    Similarly, the DOL's contention that Nursetemps "penalized" workers who refused or cancelled shifts is of no moment.  *See Scantland*, 2012 WL 1080361, at *15 (testimony that cable installers were penalized for rejecting work orders did not prevent finding that plaintiffs were independent contractors because the nature of the work required defendant to have sufficient installers available to carry out work orders, and the "type of control . . . involved [was] directed to the ability to provide reliable service.")  These "infrequent assertions of minimal oversight do not constitute the requisite degree of supervision." *Martinez-Mendoza v. Champion Int'l Corp.*, 340 F.2d 1200, 1211 (11th Cir. 2003).

116.    Accordingly, this Court finds that this prong weights in favor of finding that the healthcare workers at issue are properly classified as independent contractors.

### *The healthcare workers at issue controlled their profits and losses*

117.    The opportunity for profit or loss "asks whether, through their own initiative or managerial skills [the healthcare workers] had the opportunity for realizing profit." *Aimable v. Long Scott Farms*, 20 F.3d 434, 443 (11th Cir. 1994).

118.    This factor weighs in favor of independent contractor status because the healthcare workers' opportunities for profit were not dependent upon Nursetemps, but were directly dependent upon their own initiatives, activities, and decisions.  It is undisputed that the healthcare workers have the ability to choose their shifts, including the opportunity to select those shifts that pay more, as well as the ability to work as many shifts as they wish or work for other nurse registries/staffing agencies.  Moreover, certain healthcare workers testified that they had the ability to negotiate their pay rates, with Ms. Petty being the most notable example.

119.    Thus, this factor favors finding that the "healthcare workers" at issue are independent contractors and not employees of Nursetemps. *See Martin v. NITV, LLC*, 2007 WL 1560202, at *2 (S.D. Fla. May 29, 2007) (finding, amongst other reasons, that teacher was

independent contractor where defendant guaranteed each teacher a specific number of classes per year, but teacher could opt to teach as many classes as he wished).

120.    The healthcare workers' "ability to choose how much they wanted to work" and choose jobs that are more profitable weighs in favor of independent contractor status. *Herman*, 161 F.3d at 304 (holding that drivers opportunity for profits and loss was determined to a great degree by their ability to choose how much they wanted to work and select profitable routes and finding that "opportunity for profit and loss" factor "points toward independent contractor status"); *Freund*, 185 Fed. Appx. at 783 (noting that district court gave weight to testimony that cable installers could accept jobs from other companies); *Mack v. Talasek*, No. 09-53, 2012 WL 1067398, at *3-4 (S.D. Tex. Mar. 28, 2012) (holding that gate guard's ability to increase profits by working more, either by taking on more jobs with defendant or by taking on jobs with other companies weighed in favor of independent contractor status).

121.    It matters not that the healthcare workers earned a fixed hourly rate because the complete ability to control profits and losses is not required. *Scantland*, 2012 WL 1080361, at *16 (holding that "constraints" on ability to control profits and losses, such as defendant's control of routes assigned and pay per job, travel time between jobs, and scheduled time slots did not prevent finding of independent contractor relationship); *Carrell*, 998 F.2d at 333-34 (holding that pipe welders still controlled profit and loss – even if defendant paid welders a *fixed hourly rate and controlled number of hours worked* – by consistently finding welding work with other companies and maximizing costs) (emphasis added); *Chao v. Mid-Atl. Installation Servs., Inc.*, 16 Fed. Appx. 104, 107 (4th Cir. 2001) (noting that cable installers were "not solely in control of their profits or losses" since they cannot unilaterally determine how many customers to service on a given day or the rate at which they will be paid for a job, but still finding that cable installers controlled profit and loss by improving technique and through experience which enabled them to find more work at higher rates).  Moreover, the hourly rates in this case were

anything but "fixed."  Each healthcare worker had the opportunity to choose a facility and negotiate an hourly rate.  Rates at different facilities differed, rates for different shifts varied, and these rates were, as indicated above, negotiable.

122.    Furthermore, (as in this case) the incorporation of some workers indicates the "presence of independent entities, each having its own opportunity for profit and loss," which also "favors a finding that Plaintiffs were independent contractors."  *Scantland*, 2012 WL 1080361, at 17.

123.    At the very least, this factor is neutral.  *Scruggs*, 2011 WL 6026152, at *6 (finding that "opportunities for profits and loss" factor did "not strongly tip the scales one way or another" where plaintiffs controlled amount of work they agreed to accept from defendant but where defendant was the primary cable installer in their region and, thus, largely dictated the extent of work given out).

### *The "healthcare workers" invested in their own equipment to complete job tasks*

124.    Many cases, such as *Parrilla*, 2009 WL 2868432, at *2, discuss this prong of the analysis in terms of a contractor's investment in material or tools necessary to perform the contractor's functions.  However, in this context, the tools of a "healthcare worker's" trade are skills, education and medical supplies.

125.    Here, healthcare workers consistently testified that they are financially responsible for obtaining and renewing their licensure, in addition to their CEUs, and that Nursetemps does not reimburse them for these costs.  Moreover, the healthcare workers uniformly testified that they provide their own stethoscopes, blood pressure cuffs, thermometers, and uniforms, in addition to other equipment.

126.    Although the DOL repeatedly attempted to point out the allegedly small dollar value of these investments, a relatively small investment by workers does not require a finding of an employment relationship, especially, where – as in this case – the work itself does not call for

a large capital investment.  *See Donovan v. Brandel*, 736 F.2d 1114, 1118-19 (6th Cir. 1984) (noting plaintiffs' relatively small investment in their business consisting of only a pail and gloves was not determinative of issue of employment and further stating that the investment factor is probative if the work itself calls for a large capital investment).

127.    Alternatively, this factor should be viewed as "neutral" since both parties' expenditures are minimal.  *Murray*, 512 F. Supp. 2d at 1279-80 (considering "investment" factor was "neutral" where sales representative paid for car and insurance and worked out of her home and defendant invested in cell phone, catalogues, and business cards). Further, even if this factor weighed in favor of Petitioner, in the overall view of this case, the weight of this factor is minimal.

### *The "healthcare workers" referenced by the DOL possess highly specialized skills*

128.    The specialized skills possessed by the healthcare workers and their use of those skills in an independent manner shows that they are independent contractors.  In analyzing whether the services rendered required a special skill, courts consider, amongst other factors, whether the individual was required to pass an exam, attend training classes, and demonstrate his or her proficiency in that particular profession.  *See Santelices v. Cable Wiring*, 147 F. Supp. 2d 1313, 1320 (S.D. Fla. 2001).  All of the foregoing factors of the instant prong in the analysis weigh in favor of independent contractor status.

129.    Indeed, there can be no question that nursing skills, which are subject to intense governmental and scholastic scrutiny, are highly specialized.  The LPNs who testified stated that they had to (a) take a thirteen-month, full-time licensure program, which included clinical rotations, (b) pass a board exam to obtain their license, and (c) take CEUs to maintain that license.  Unlike the cable installers in the *Parrilla* and *Santelices* cases – where installers learned on the job or took minimal training to apply their craft in the field – nurses and healthcare professionals are required to learn and apply their skills in tightly controlled learning

33

environments before they are licensed or certified to service the general public.  Thus, based on the record evidence, it is undisputed that being an RN, LPN, or CNA requires "special skill," and accordingly, this prong of the economic realities test favors this Court finding that the "healthcare workers" in dispute are independent contractors.

130.    This factor still weighs in favor of a finding of independent contractor status if the majority of the healthcare workers' skills were obtained through on the job experience. *Scantland*, 2012 WL 1080361, at \*18.  *Compare Lindsley v. Bellsouth Telecomm., Inc.*, No. 07-6569, 2009 WL 537159, at \*2 (E.D. La. Feb. 27, 2009) ("skill" factor weighed in favor of independent contractor status were telephone line splicer acquired experience and training working for a friend for approximately one year); *and Ruiz v. Affinity Logistics, Corp.*, No. 05-cv-2125, 2012 WL 3672561, at \*9 (S.D. Cal. Aug. 27, 2012) (delivery drivers possessed "substantial skill" because they were required to install appliances, which took extensive experience in recognizing potential complications and hazards) *with Parrilla*, 2009 WL 2868432, at \*5 (installation technician did not require special skill where knowledge was acquired "in as little as two weeks of on the job training.")

131.    In terms of initiative required, the ability to find consistent work with other companies or by moving from job to job weighs in favor of independent contractor status even if a worker's initiative was limited to decisions regarding his/her work once on a job.  *See Carrell*, 998 F.2d at 333.  It is undisputed that the healthcare workers have the ability to work for other nurse registries and staffing agencies.  It also bears mention that the Independent Contractor Agreement signed by the healthcare workers does not include a non-compete clause.  Whether the healthcare workers rely solely upon Nursetemps for referral opportunities is totally within their control.  If an attorney chooses to work for only one client or a plumbing subcontractor chooses to accept jobs from only one general contractor, that is a self-imposed limitation, not one necessitated by the working relationship. As indicated above, all nurses giving testimony

understood that they would not be guaranteed a minimum number of shifts or hours. On this basis alone, any finding that they were economically dependent upon Respondents would be unwarranted and unjust.  Accordingly, this factor weighs in favor of a finding that the healthcare workers were independent contractors, rather than employees, in the instant case.

### *There is no degree of permanence in the healthcare workers' relationships with Nursetemps.*

132.    The very nature of a nurse registry lends itself to impermanence and, thus, this factor weighs in factor of independent contractor status.  Extended periods of time between jobs, the ability to end the relationship with Nursetemps without notice or cause, and the ability to work for other companies – all of which are present in this case – are indicative of independent contractor status.  *See Freund*, 185 Fed. Appx. at 784 (reasoning that relationship lacked "significant degree of permanence" where cable installers could take jobs from other installation brokers and could take as few or as many jobs from defendant as desired); *Mack*, 2012 WL 1067398, at *5 (holding that ability to accept other work during extend period of time off between jobs weighed in favor of independent contractor status); *Carrell*, 998 F.2d at 332, 334 (ability to work for multiple companies weighed in favor of independent contractor status); *Molina*, 420 F. Supp. 2d at 1287 (holding that independent contractor agreements terminable at will upon 24-hours' notice and ability to work for other companies during time with defendant indicated that plaintiffs' relationship with defendant "was that of an independent contractor.")

133.    Mr. Hoover, Ms. Ziegler, and Ms. Ford all testified that they accepted shifts from other staffing agencies while also accepting shifts from Nursetemps, and that Nursetemps permitted them to do so.  Moreover, Ms. Disselhoff and Ms. Davis both went to work for Nursetemps' clients immediately after they stopped accepting shifts from Nursetemps without any issue.  Further, several healthcare workers testified that they did not work for prolonged periods of time: Ms. Ziegler did not accept any shifts for two consecutive months; Ms. Stephens did not accept shifts for three consecutive months; Mr. Hoover did not accept shifts for five

35

consecutive months; and Ms. Black did not accept shifts for three years.  These established facts epitomize the definition of impermanence, and hence lend themselves to the conclusion that these healthcare workers were independent contractors.

134.    Additionally, the execution of an independent contractor agreement that does not contain a covenant-not-to-compete − as in this case − weighs strongly in favor of a finding of independent contractor status.  *Herman*, 161 F.3d at 305 (relying entirely upon delivery drivers' execution of independent contractor agreement that did not contain non-compete clause to find that "permanency of the relationship" weighed in favor of independent contractor status).

135.    Even if some individuals chose to establish a long-term relationship with Nursetemps, a finding of employee status does not necessarily follow.  Rather, such facts would render this factor "neutral."  *Chao v. Mid-Atl. Installation Servs., Inc.*, 16 Fed. Appx. at 107.

### *Other relevant considerations weigh in favor of the independent contractor status*

### *Self-identification of independent contractors*

136.    Self-identification as "independent contractors" on income tax returns also weighs in favor of independent contractor status.  *Martin v. NITV, LLC*, No. 06-80667, 2007 WL 1560202, at *2-3 (S.D. Fla. May 29, 2007) (holding that plaintiff was an independent contractor because, in part, he signed an independent contractor agreement, indicated that he was an independent contractor on his IRS tax forms, and did not dispute his status); *Carrell*, 998 F.2d at 334 (welders found to be independent contractors because they were aware that defendant classified them as independent contractors and many of them classified themselves as self-employed); *Lindsley*, 401 Fed. Appx. at 946 (cable splicer found to be independent contractor in part because he considered himself "self-employed" and paid self-employment tax).  While only a couple of witnesses recalled how their taxes were done, it is clear that all were treated for tax purposes as independent contractors.

137.    Ms. Petty testified that she did her own taxes and deducted expenses, including mileage and supplies, and that she paid her own taxes because she was an independent contractor.  [12/11, pp. 133-34].

138.    Ms. Walkes also testified that she received a 1099 Form from Respondents, and that she ended up working for a different agency because they took out taxes and Respondents did not.  [12/11, pp. 202, 215-16].

### *Whether the workers are integral to the business*

139.    "Generally, the more integral the work, the more likely the worker is an employee, not an independent contractor."  *Scruggs*, 2011 WL 6026152 at *8.   In the aggregate, healthcare workers are arguably integral to Nursetemps' business of staffing. However, when viewed independently – as the Court should do in this case – the healthcare workers are not integral to Nursetemps' business.  *Murray*, 512 F. Supp. 2d at 1279 (holding that sales representative was independent contractor even though, when viewed as a group, sales representatives brought in nearly all of defendant's business, because, when viewed individually, plaintiff only made one sale and worked for defendant for less than one year and, thus, was "not integral.")   In the case at bar, it is apparent that Respondents had a large number of nurses from which to choose and kept business relationships with each of these nurses so that no one nurse was "integral" to maintaining business operations.

140.    Furthermore, assuming that healthcare workers are integral to Nursetemps' business, the existence of an employee relationship does not automatically follow.  This factor is not dispositive.  In fact, courts – including the Eleventh Circuit – routinely have held that this factor weighs in favor of employee status, but ultimately found that plaintiffs were independent contractors.  *Freund*, 185 Fed. Appx. at 784 (affirming district court's finding of independent contractor relationship where "integral" factor weighed in favor of employee

relationship and others did not); *Scantland*, 2012 WL 1080361, at \*18-19 (holding that cable installers were independent contractors despite finding services performed by technicians were integral to defendant's business); *Chao*, 16 Fed. Appx. at 107 (noting that district court concluded that cable installers were "integral" to defendant's business of brokering cable installation to cable providers but recognizing that "this factor, standing alone, does not create an employment relationship" and holding that cable installers were independent contractors); *Scruggs*, 2011 WL 6026152, at \*8 (noting that cable installers were the "lifeblood" of defendant's business, but holding that any inference of employee status that followed was "superficial" because "this factor alone cannot alter the overall impression that . . . installers are economically independent.")

141.    Accordingly, this Court does not find that one factor potentially weighing in the DOL's favor demonstrates that, under the totality of the circumstances, the healthcare workers at issue are employees. Further, the Court is mindful that its analysis as to whether Respondents are in contempt of a previous order is not dependent on the number of factors weighing in favor of employee status, but, as explained below, the closeness of the overall issue and whether such closeness favors a ruling that Respondents are not in contempt.

142.    The ultimate finding of an independent contractor relationship does not require that all six factors weigh in favor of such status. Rather, courts – including those in this Circuit – have found that an independent contractor relationship exists where a majority of the factors weighed in favor of such status. *Murray*, 512 F. Supp. 2d at 1278-79 (holding that sales representative was independent contractor even though "relative investment" factor was neutral and "skill and imitative" factor weighed in favor of employee status); *Scantland*, 2012 WL 1080361, at \*18-19 (holding that cable installers were independent contractors even though "permanency" factor weighed "mildly in favor of" employee status because term provision in

independent contractor agreements expected the working relationship to be ongoing and "integral" factor weighed in favor of employee status); *Herman*, 161 F.3d at 303-06 (affirming trial court's finding that delivery drivers were independent contractors even though "skill and initiative" and "relative investment" factors weighed in favor of employee status); *Scruggs*, 2011 WL 6026152, at \*4-8 (holding that plaintiff cable installers were independent contractors even though "opportunity for profit or loss" and "integral part of business" were found not to "tip the scales one way or the other"); *Mack*, 2012 WL 1067398, at \*1-6 (holding that gate guards were independent contractors even though "skill and initiative" and "relative investment" factors weighed in favor of employee status).

143.    Thus, based on the foregoing, the totality of the circumstances clearly shows that Respondents have appropriately classified these workers as independent contractors.

**C.    No Evidence Of Recordkeeping Violations**

144.    The DOL contends that Respondents failed to comply with the recordkeeping regulations of the FLSA. Specifically, 29 C.F.R. §516.2 requires, amongst other things, that employers keep the following records for all employees**:** full names; home addresses; dates of birth; sex and occupation; time of day and day of week on which the employee's workweek begins; regular hourly rate; hours worked each workday; total daily or weekly straight time earnings or wages due for hours worked during the workweek, exclusive of overtime compensation; total premium pay for overtime hours; total additions or deductions from wages paid during each pay period; total wages paid each pay period; and date of payment and the pay period covered by the payment.

145.    As a threshold matter, Respondents had no obligation to comply with 29 C.F.R. §516.2 for healthcare workers in the State of Florida because they were properly classified as

independent contractors.  Even assuming *arguendo* that they were not properly classified (which is not the case), the FLSA does not require employers to keep all of the above information on one single report, as the DOL tries to assert.  Moreover, it is clear that all of the above information was readily available.  Indeed, Mr. Gustafson, who was mainly responsible for operating the system which tracks how and when healthcare workers are paid, testified that the system was very flexible. Sometimes, however, in order to get all the information, one would have to print two different reports.  Yet, all the information is available on the system relating to how these healthcare workers get paid, including how much they get paid, the rate of pay, the number of hours worked at each particular rate, and any other necessary information referenced in 29 C.F.R. §516.2.  [12/12, pp. 208-10].  If someone worked more than 40 hours in a week but turned their timecard in late, the record was supplemented and the pay corrected.  When mistakes were made and brought to Mr. Gustafson's attention, he fixed them, and the company has records of this.  [12/12, pp. 211-12].

**D.**     **Substantial Compliance**

146.   Even assuming *arguendo* that some or even all of these factors could arguably go either way leads inescapably to the conclusion that Nursetemps substantially complied with the Consent Judgment.  *See Chao v. Gotham Registry Inc.*, 514 F.3d 280 (2d Cir. 2008) (holding that where nurse registry attempted with reasonable diligence and energy to comply with the FLSA's overtime requirements, contempt finding was not appropriate). There are many congruencies in the instant case with the situation in *Gotham Registry Inc.* in that the issue of compliance with the Court's previous Order should be the focus and whether Petitioner has demonstrated contempt by clear and convincing evidence. Given the efforts taken by Respondents subsequent to the Court's Order, the lack of guidance by the DOL and

lack of finding that the nurses in the instant case were previously deemed employees rather than independent contractors, and the closeness of the analysis for each separate factor in the economic realities test, this Court finds that Respondents are not in contempt.

**E.      The DOL Is Not Entitled To Enlarge The Judgment**

147.    Because this Court finds that Respondents are not in contempt of the Consent Judgment, the DOL has no valid basis on which to seek an "enlargement" of this Court's Order. Even assuming *arguendo* that this Court finds that the "healthcare workers" are employees (which it should not), the DOL has still failed to set forth any grounds upon which it can enlarge the Consent Judgment.  Indeed, an Order "may not be expanded beyond the meaning of its terms absent notice and an opportunity to be heard."  *Riccard v. Prudential Ins. Co.*, 307 F.3d 1277, 1296 (2002) (citing *United States v. Greyhound Corp.*, 508 F.2d 529, 537 (7th Cir. 1974); *Florida Ass'n for Retarded Citizens, Inc. v. Bush*, 261 F.3d 1296, 1063-64 (11th Cir. 2001); *Reynolds v. Roberts*, 207 F.3d 1288, 1300-01 (11th Cir. 2000)).  Although the DOL's Petition states in its introductory paragraph that it seeks an "enlargement" of the Court's Order, (Doc. 20, p. 1), the DOL has failed to set forth with any specificity or explanation whatsoever exactly what such an "enlargement" would consist of.  This cannot constitute "notice," and the DOL's request should, therefore, be denied.

WHEREFORE, this Court finds that Respondents are not in violation of the Consent Judgment and, thus, such Consent Judgment should not be enlarged.

Respectfully submitted,

*/s/ J. Robert McCormack*
**J. ROBERT MCCORMACK**
Florida Bar Number: 864791
E-mail: bob.mccormack@odnss.com
**WILLIAM E. GROB**
Florida Bar Number: 0463124
E-mail: william.grob@odnss.com
**HEATHER J. CASAGRANDE**
Florida Bar Number: 016109

E-mail: heather.casagrande@odnss.com
**OGLETREE, DEAKINS, NASH,**
**SMOAK & STEWART, P.C.**
100 N. Tampa Street, Suite 3600
Tampa, FL 33602
Telephone: 813.289.1247
Facsimile: 813.289.6530
Attorneys for Respondents

<u>**CERTIFICATE OF SERVICE**</u>

**I HEREBY CERTIFY** that on March 6, 2013, a true and correct copy of the foregoing was filed with the Clerk of Court via the CM/ECF system, which will furnish an electronic copy to Petitioner's attorney, of the U.S. Department of Labor, Office of the Solicitor, Dane Steffenson, 61 Forsyth Street, S.W., Room 7T10, Atlanta, GA 30303.

*/s/ J. Robert McCormack*
J. Robert McCormack

14429496.1