UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
OCALA DIVISION

HILDA L. SOLIS, SECRETARY
OF LABOR, UNITED STATES
DEPARTMENT OF LABOR,

    Petitioner,

-vs-                                          Case No.    5:07-cv-182-Oc-10PRL

A+ NURSETEMPS, INC. and
MICHAEL J. ARTHUR,

    Respondents.
_____/

MEMORANDUM OPINION
INCLUDING
FINDINGS OF FACT
AND
<u>CONCLUSIONS OF LAW</u>

This is a Fair Labor Standards Act case, 29 U.S.C. § 201 *et seq.* ("FLSA"), that began on May 4, 2007. The Department of Labor, through the Secretary of Labor, sued A+ Nursetemps, Inc. and its principal, Michael J. Arthur, claiming that they were employers of temporary health care workers engaged in commerce, and that such workers were not being paid overtime compensation due to them under the Act (Doc. 1).[1]

---

[1] The Respondents' business model is that of a staffing agency or labor contractor doing business in the health care industry. Pursuant to contracts it has with various health care organizations (including hospices, hospitals and detention facilities), A+ Nursetemps supplies health care personnel including both registered and licensed practical nurses to its clients for shift work in the client's facility. For these services the client pays A+ Nursetemps which, in turn, pays the nurses. The nurses are classified by A+ Nursetemps as independent contractors and are not paid overtime.

The case was initially resolved by the entry of a consent judgment on November 25, 2008 (Doc. 19). The judgment was in two parts. First, the Respondents were permanently enjoined from violating the provisions of the Act by employing "any employee in commerce . . . for more than 40 hours in a workweek unless such employee is compensated for such hours at an overtime rate of at least one and one-half times the regular rate at which such employee is employed."[2] (Id., ¶ 1). The Respondents were also enjoined from failing to keep employment records as prescribed by 29 C.F.R. § 516.2 (Id., ¶ 2).

The second part of the consent judgment (Doc. 19) set out back wages in the aggregate amount of $ 21,704.02, and liquidated damages of $ 8,295.98, to be paid to the Department of Labor on behalf of 53 named employees who were identified on an attachment to the judgment.[3]

The case became dormant after entry of the judgment, and it remained so for three and a half years until May 22, 2012. On that date the Department of Labor filed a motion for an order to show cause (Doc. 20) why the Respondents should not be held in contempt for violating the injunction. The Department alleged that the Respondents were in violation because they were still not paying overtime

---

[2]   For better or for worse, the court notes that the injunction was wholly superfluous in the sense that it did nothing more than recite the Respondents' FLSA statutory obligation that was already extant. Specifically, the judgment did not resolve the legal dispute between the Parties concerning the status of the subject workers as covered employees or non-covered independent contractors.

[3]   The record does not reflect the filing of any formal satisfaction of the monetary debt created by the judgment, but the Court assumes that all required sums were paid because the Department of Labor has not claimed otherwise.

compensation to their health care workers.  The Respondents replied (Doc. 27) to the Department's motion and denied any violation or contempt, contending that the subject health care workers were independent contractors, not "employees" covered by the FLSA.

In their subsequent pretrial statement (Doc. 59) the Parties identified, as the dominant issue to be tried, the question whether the Respondent's health care workers are employees or independent contractors for purposes of the FLSA (Id. at Part XII, pp. 18-19, ¶¶ 2, 6 and 9).  The case was then tried to the Court at a four day bench trial, after which the Court entertained oral argument and directed the filing of proposed findings and conclusions (see Doc. 83).  Those proposals have been submitted and the case is now ready for decision.

If the employee/independent contractor issue in this case had arisen in any other context not governed by the FLSA, it could present a closer question.[4] Nursetemps argues that it exercises no supervision or control over the nurses' work on the client's premises, and that this fact suggests that the nurses are, therefore,

---

[4]   In Garcia v. Copenhaver, Bell & Assoc., M.D.'s, P.A., 104 F.3d 1256, 1266 (11th Cir. 1997) the court of appeals observed that there are three different tests for distinguishing between an employee and an independent contractor, the first being the common law agency test established by the Supreme Court in Community for Creative Non-Violence v. Reid, 490 U.S. 730, 751-752, 109 S. Ct. 2166, 2178-2179 (1989).  Under that test, the dominant factor suggesting an employment is "the hiring party's right to control the manner and means by which the work is accomplished."  Garcia, 104 F.3d at 1266 (quoting Daughtrey v. Honeywell, Inc., 3 F.3d 1488, 1495-96 (11th Cir. 1993).  See also Robison By and Through Bugera v. Faine, 525 So. 2d 903 (Fla. Dist. Ct. App. 1987), and Freedom Labor Contractors of Florida, Inc. v. State Division of Unemployment Comp., 779 So. 2d 663 (Fla. Dist. Ct. App. 2001).

independent contractors.[5]  That, however, is a *non-sequitur* because it assumes that the nurses work independently, without supervision or direction at the facility of the client.  If the right to supervise and control the manner and means of accomplishing the work remains in the client at the facility where the work is performed, then the client would likely become a joint employer together with Nursetemps, and the nurses would still be employees under the FLSA, not independent contractors.  See Antenor v. D & S Farms, 88 F.3d 925 (11th Cir. 1996).

In any event, the Supreme Court has held that the term "employee" as used in the FLSA must be given a broader meaning.  Rutherford Food Corp. v. McComb, 331 U.S. 722, 67 S. Ct. 1473 (1947).  See also, Medrick v. Albert Enterprises, Inc., 508 F.2d 297 (5th Cir. 1975) in which the court of appeals held:

> The statutory coverage [of the FSLA] is not limited to those (whose work activities satisfy the common law 'control' test) but rather to those who, as a matter of economic reality, are dependent upon the business to which they render service.

508 F.2d at 300 (quoting Fahs v. Tree-Gold Co-op. Growers of Florida, Inc., 166 F.2d 40, 44 (5th Cir. 1948)).[6]

Thus, the Parties have stipulated in the Pretrial Statement (Doc. 59, Part XII, p. 19, ¶ 9) as they were compelled to do by the clearly established law in this Circuit, that the "economic realities test" is the standard to be applied in deciding this case. And, after applying that more liberal standard, the Court has concluded that the

---

[5]   For convenience, the court will use "Nursetemps" to refer to both Respondents.

[6]   Decisions of the Fifth Circuit before October 1, 1981 are binding precedent in the Eleventh Circuit.  Bonner v. City of Pritchard, 661 F.2d 1206 (11th Cir. 1981).

4

Department of Labor has established by clear and convincing evidence that the subject workers are employees of the Respondents for purposes of the FLSA, not independent contractors, and they are subject to the protection of the Act.

Specific findings of fact and conclusions of law will follow.

## **Findings of Fact**

1.      A+ Nursetemps is a licensed, temporary health care staffing agency and nurse registry under Florida law.  See Florida Statutes (2012) Chapter 408, Part II, §408.801 *et seq.*; §408.802(15) and §400.506).  Its office is located in Inverness, Citrus County, Florida, within the Middle District of Florida.

2.      At all times material to this case, Nursetemps has been an enterprise engaged in commerce with an annual gross volume of sales or revenue in the amount of $ 500,000 or more, and it is subject to the FLSA.

3.      At all times material to this case the Respondent, Michael J. Arthur, was the President and sole stockholder or owner of Nursetemps.  He supervised all of the business operations of Nursetemps.  Health Force is another business name used by Nursetemps through which it places nurses in health care facilities for longer work periods than so-called per diem nurses who are assigned daily shifts.

4.      Nursetemps places nurses to work in facilities in multiple states and has maintained offices in both Alabama and Florida.

5.      Nursetemps has maintained a website on the internet to recruit both nurses and clients.  See http://www.nurse-temps.com.

6.      Nursetemps has numerous clients providing health care services such as hospitals, hospices and detention facilities with which Nursetemps has entered into substantially similar contractual agreements.  Pursuant to those agreements Nursetemps furnishes health care personnel including registered nurses, licensed practical nurses and certified nursing assistants to its clients for shift work in the client's facilities.[7]

7.      Nursetemps has approximately 300 licensed nurses listed in its nurse registry consisting of "travel" nurses and per diem nurses, including both registered nurses and licensed practical nurses.

8.      Nursetemps' per diem nurses are assigned to work at a client's facility upon receipt of a request from the facility for coverage of a given shift.

9.      The nurses are not required to work (and are not guaranteed) a specific number of shifts or hours per week, month or year, and they may decline a shift or shifts to take time off without penalty.  They are also permitted to perform work for other staffing agencies or other employers while also providing services to Nursetemps.

10.     Nurses are free to negotiate the hourly rate paid to them by Nursetemps for work at the facility where they normally accept shift assignments, but such negotiations rarely occur.  Nurses do have the ability to receive different rates of pay

---

[7]    For convenience, the Court will use the term "nurses" to include all health care personnel being provided by Nursetemps to its clients.

depending upon the facility at which they choose to accept shifts, the type of shift that they choose, and the distance they travel to work.

11. Nursetemps does not provide, nor does it reimburse, health care workers for any equipment used to perform their work duties, including stethoscopes, blood pressure cuffs, and scrubs and/or uniforms.

12 Nurses who subscribe to Nursetemps' registry are responsible for the costs of renewing their licenses and for staying up to date on their continuing education credits.

13. To become a licensed practical nurse ("LPN") in Florida, an individual must obtain a license to practice, which involves a full-time, year-long course of study and clinical rotations, in addition to passing a board exam.

14. Nurses who subscribe to Nursetemps' registry are required to demonstrate their proficiency through skills tests before Nursetemps will offer the worker a shift to work.

15. Nurses complete their own time cards which are verified by the facility at which they have performed shift work and are delivered by the worker to Nursetemps on a regular basis.

16. The nurses are paid by Nursetemps for all hours worked and can choose to be paid daily, weekly or periodically.

17. Nurses are referred to in Florida's licensing law as "independent contractors," and Nursetemps treats the nurses listed in its registry as independent contractors, not as employees.  It also enters into form agreements with the nurses

purporting to classify them in that way. As a consequence, the nurses are not paid FLSA overtime rates and no tax is withheld from their pay.

18. The nurses are dependant upon Nursetemps to find and provide work, and they typically accept the shifts they are offered.

19. As required by various client facilities and to maintain accreditation by the Joint Commission,[8] Nursetemps provides worker's compensation insurance coverage for the nurses it regards as independent contractors.

20. The nurses accepting work assignments from Nursetemps typically do not advertise their services or secure business licenses or telephone listings or website addresses, and do not maintain offices as individual entrepreneurs.

21. The nurses accepting work assignments from Nursetemps do not employ others and do not purchase any business insurance coverages.

22. Some nurses accepting work assignments from Nursetemps formed – at Nursetemps' suggestion – limited liability entities or corporations under Florida law, but the existence of those entities did not alter or change in any way the assignment of work or the manner in which work was performed, or the means of compensation, or any other aspect of the relationship between the nurses and Nursetemps.

23. Nurses accepting work assignments from Nursetemps and working under identical circumstances in Alabama are classified and treated by Nursetemps as employees, not independent contractors.

---

[8] The Joint Commission for Accreditation of Health Care Providers is an industry not-for-profit organization that establishes standards and accredits health care providers that meet those standards. See http://www.jointcommission.org

24. Any discipline (such as not being assigned to a complaining facility) is administered to a nurse for job related insufficiency or wrong doing by Nursetemps, not by the facility to which the nurse has been assigned.

25. Nurses are an integral part of the business of Nursetemps which has no revenue other than the income derived from its clients for the services provided by the nurses; and many of the nurses have accepted shift assignments from Nursetemps on a regular basis for more than a year rather than performing sporadic or isolated engagements more akin to projects undertaken by independent contractors.

26. Nursetemps has not maintained employment records with respect to its nurses in the form and manner required by 29 C.F.R. § 516.2, particularly the requirement that such records must show the hours worked (and compensation paid) to each employee during each work week.

## **Conclusions of Law**

1. This Court has both subject matter and *in personam* jurisdiction, and venue is proper in this district and division. See 29 U.S.C. §§ 207 and 216; 28 U.S.C. §§ 1331 and 1345.

2. The Respondents constitute an enterprise engaged in commerce as defined in 29 U.S.C. § 203(s)(1)(A), are covered by the FLSA, and both are employers as defined in 29 U.S.C. § 203(d).

3. The FLSA defines "employ" as including "to suffer or permit to work." 29 U.S.C. § 203(g)

4.      The Supreme Court has observed that this definition of an employment relationship is "the broadest definition that has ever been included in any one Act." United States v. Rosenwasser, 323 U.S. 360, 363 n.3, 65 S. Ct. 295, 296 n. 3 (1945) (quoting 81 Cong. Rec. 7656-57 (1937) (statement of Sen. Hugo Black)).  See also Patel v. Quality Inn South, 846 F.2d 700, 702 (11th Cir. 1988).

5.      Labels, titles or job names that may be applied by the Parties to a given position or job function through a contract or otherwise, or even legal designations in other statutes or governmental regulations, do not affect the determination of a worker's status under the FLSA.  Thus, a worker may be an independent contractor under other laws or for purposes of contractual relationships, yet still meet the definition of an employee under the FLSA.  See Nationwide Mut. Ins. Co. v. Darden, 503 U.S. 318, 326, 112 S. Ct. 1344, 1349-1350 (1992) (FLSA's definition of employee is broader than ERISA); Walling v. Portland Terminal Co., 330 U.S. 148, 150; 67 S. Ct. 639, 640 (1947) (FLSA encompasses more employees than the common law definition).

6.      It follows that any characterization of nurses as independent contractors under state law, by statute or otherwise, has no bearing upon whether an individual is an employee for purposes of the FLSA.  See U. S. Constitution, Art. VI, § 2.  See also Darden, supra, 503 U.S. at 323, n. 3, 112 S. Ct at 1348, n. 3.  The Florida decisions upon which Nursetemps relies, Robinson By and Through Bugera v. Faine, 525 So. 2d 903 (Fla. Dist. Ct. App. 1987) and Freedom Labor Contractors of Florida, Inc. v. State Division of Unemployment Comp., 779 So. 2d 663 (Fla. Dist. Ct. App.

2001) are not binding and are distinguishable because both decisions applied the common law test which emphasizes the factor of control in determining independent contractor status.

7. The Eleventh Circuit cases clearly establish that the "economic realities test" is the standard to be applied in determining whether a worker is an employee covered by the FLSA, or is an independent contractor who is not covered by the Act. Medrick v. Albert Enterprises, Inc., 508 F.2d 297 (5th Cir. 1975); Villarreal v. Woodham, 113 F.3d 202 (11th Cir. 1997); Freund v. Hi-Tech Satellite, Inc., 185 Fed. Appx. 782 (11th Cir. 2006).[9] See also Antenor, 88 F.3d 925 (applying the economic realities test in resolving a joint employer issue under the FLSA).

8. Each of those pertinent Eleventh Circuit decisions recite various factors to be considered in applying the economic realities test, and the lists are not identical. All of the cases agree, however, either implicitly or explicitly, that "[n]o one of these considerations can become the final determinant, nor can the collective answers to all of the inquiries produce a resolution which submerges consideration of the dominant factor – economic dependence." Freund, supra, 185 Fed. Appx. at 783 (quoting Usery v. Pilgrim Equip. Co., 527 F.2d 1308, 1311 (5th Cir. 1976)).

9. The factors listed in the cases include: (a) whether the alleged employer had the power to hire and fire the workers in question; (b) whether the alleged employer supervised and controlled the employee work schedules or conditions of

---

[9] Decisions published in the Federal Appendix are not binding precedent, but may be cited as persuasive authority. See Fed. R. App. P. 32.1; 11th Cir. R. 36-2.

11

employment; (c) whether the alleged employer determined the rate and method of payment; (d) whether the alleged employer maintained work time records; (e) whether the worker performed a specialty job requiring specialized training or skill; (f) whether the contractual terms of the employment varied in a material way as one worker succeeded another; (g) whether the workers had business organizations that could offer the worker's services to others; (h) whether the alleged employer supplied the premises and/or the equipment necessary to perform the work; (i) whether the worker employed others to assist in performing the job; (j) the employee's opportunity for profit or loss depending upon management skill; (k) the degree of permanency or duration of the working relationship; and (l) the extent to which the service rendered by the worker is an integral part of the employer's business.

(a) <u>The right to hire and fire</u>. The Court interprets this factor (taken from <u>Villarreal</u>, <u>supra</u>) to require an examination of whether the employer has retained the usual common law right to hire and fire at will, or has placed limitations on those rights by contract as would often be the case in dealing with an independent contractor and a contractual clause imposing liability or a penalty for cancellation of the work. Here, of course, Nursetemps has sole control with respect to the selection of nurses to be assigned to shifts, and may withhold such assignments if it pleases. Just as the nurses are under no obligation to take assignments, Nursetemps is under no obligation to make them.

(b) <u>Control of work schedules and supervision of the work</u>. This factor (also taken from <u>Villarreal</u>, <u>supra</u>) has two aspects as applied to this case. Control of the

work schedules, in terms of assigning work to the nurses, is in the hands of Nursetemps. Supervision of the work, however, is not. That control is in the hands of the client facility, not Nursetemps. Thus, as stated earlier, if the common law test applied, Nursetemps would have a stronger case. In the context of an FLSA examination, however, this division of control does not help the nurses' independent contractor argument because control of the work does not shift to the nurses, it shifts to another entity (which may thereby become a joint employer, Antenor v. D & S Farms, supra,) but it does not mean that the nurses thereby become independent contractors.

(c) <u>Determining the rate and method of payment</u>. In an independent contractor relationship, the independent contractor normally has at least an equal say in the rate to be charged for particular work by bidding on the job or by posting or advertising standard rates for the work to be performed. Here, by contrast, it is Nursetemps that fixes the hourly rate it will pay the nurses for each shift or each assignment. Individual nurses have the right to negotiate with respect to the rate they will earn, but Nursetemps retains the upper hand in deciding the rate it will pay; and it is Nursetemps that pays the nurses, not the facility where the work is performed.

(d) <u>Maintenance of time records</u>. While the nurses keep their own time records, they are paid by the hour, and such records are turned in to and maintained by Nursetemps (albeit not in full compliance with 29 C.F.R. § 516.2) for the purpose of calculating the nurses' pay. Stated another way, the nurses are not paid a flat rate or piece rate per shift. They are hourly employees.

(e) <u>Performance of a specialty job requiring specialized training or skill</u>. While it cannot be denied that the work of a nurse requires highly specialized training and skill, such work in this society is not necessarily a specialty job in the sense that members of the public do not typically seek them out for private or individual engagements; rather, the nurses involved in this case work, instead, on an hourly basis in institutional settings like the hospices, hospitals and detention facilities.

(f) <u>Variation in terms of employment</u>.  There is no evidence of any variation in the terms of employment as one worker succeeds another.  Nurses are assigned to work shifts for rates established by Nursetemps and (subject to occasional negotiation of rates with an individual nurse) remain the same from nurse to nurse, shift to shift, week to week.

(g) <u>Business organization for offering nurses services to others</u>.  While some of the nurses formed limited liability or corporate entities, the evidence is that those who did so were acting at the suggestion of Nursetemps, and the existence of such entities did not change the practical day-to-day relationship between Nursetemps and the nurses in any way.  Also, the formation of such entities did not lead any of the nurses to use them as a vehicle to offer their services as entrepreneurs to other health care providers or to the public in general.

(h) <u>Premises and equipment</u>.  Nursetemps does not supply the premises on which the work is accomplished, but neither do the nurses.  The equipment necessary for the nurses to do their work – stethoscopes, blood pressure cuffs, thermometers

and uniforms are provided by the nurses who also bear the cost of their continuing educational requirements.

(i) <u>Employment of others</u>. The nurses do not employ others to assist them in the performance of their work.

(j) <u>Opportunity for profit</u>. The nurses are paid by the hour for shift work. There is no opportunity for additional income or profit through the exercise of managerial skill or increased efficiency in the manner or means of accomplishing the work.

(k) <u>Permanency of the relationship</u>. A majority of Nursetemps nurses have accepted work assignments on a regular basis for a year or more.

(l) <u>Whether the nurses work is an integral part of Nursetemps business</u>. The work performed by the nurses is more than an integral <u>part</u> of Nursetemps' business, it is the <u>whole</u> of Nursetemps' business.

10. Consideration of the foregoing factors, both individually and collectively, leads inexorably to the conclusion that Nursetemps nurses are employees for purposes of the FLSA, not independent contractors. The same result is reached when one simply steps back to take a common sense look at the nature of the relationship between Nursetemps and the nurses. While it is certainly true that the nurses enjoy a degree of flexibility in their working lives, not shared by many in the work force, including an enhanced ability to "moonlight" by working for more than one agency at a time and by choosing when and where to make themselves available for work, the simple fact remains that when the nurses <u>are</u> available for work they are dependent

upon Nursetemps to provide it, and when they <u>are</u> working on assignment for Nursetemps they are, during those workweeks, employees of Nursetemps.

11.   The Court concludes in fact and in law that the Respondents have violated the FLSA by not paying overtime compensation to its nurses for hours worked over 40 hours per week, and that such violation also constitutes a contempt of the injunctive order entered in this action on November 25, 2008 (Doc. 19).

12.   At trial, the Department of Labor offered in evidence, and the Court received, Petitioner's Exhibits 110 and 143 consisting of worksheets prepared by or under the direction of a Senior Investigator of the Wage and Hour Division of the Department of Labor based upon an examination of Nursetemps' records. Exhibit 110 reflects the names and addresses of 148 nurses employed by Nursetemps during various work weeks ending May 11, 2008, to September 11, 2011, and also shows, as to each nurse, the total amount of unpaid overtime compensation due to the nurse for overtime work during that period.  The aggregate total shown to be due is $148,830.84.  At trial, however, the Department of Labor conceded that there may be some errors in the data shown on Petitioner's Exhibits 110 and/or 143, and it was agreed that, in the event the case was decided in favor of the Petitioner as to liability (as the Court has now determined), the Respondents would be given an opportunity to suggest corrections to be made to those exhibits before judgment is entered upon them.  The Court also requires input from the parties with respect to the matter of liquidated damages and the form of the judgment and injunctive relief to be granted consistent with this opinion.

      13.    Accordingly, the Parties are directed to meet within twenty (20) days and to confer upon the preparation and submission of an agreed, proposed final judgment and injunction consistent with this opinion.  Such submission shall be made within thirty (30) days.  Any agreement by either party to the form of the judgment shall not be construed as an agreement with regard to the correctness of the judgment or a waiver of the right to seek review of the judgment in whole or in part.  If the Parties are unable to agree upon the form and/or amount of the judgment, the Petitioner shall file within thirty (30) days a proposed judgment consistent with this opinion, and the Respondents may have ten (10) days thereafter to file their objections, after which the Court will take the matter under submission.

      IT IS SO ORDERED.

      DONE and ORDERED at Ocala, Florida, this 5th day of April, 2013.

*[signature]*
UNITED STATES DISTRICT JUDGE

Copies to:   Counsel of Record
               Maurya McSheehy, Courtroom Deputy